**TEXAS & N. O. R. CO. v. HAWTHORNE.**[*]
(No. 8977.)

Court of Civil Appeals of Texas. Galveston. April 21, 1927.

Concurring Opinion April 26, 1927.

Rehearing Denied May 17, 1927.

Second Motion for Rehearing Denied June 2, 1927.

1. **Master and servant** &#8680;204(1)—**Brakeman, as matter of law, assumed risk of injury from sand cast into fire box and forced through smokestack (federal Employers' Liability Act [U. S. Comp. St. §§ 8657–8665]).**

Where alleged negligence of railroad in casting sand into fire box of engine and forcing it through the flues and smokestack to remove soot and other matter was not a violation of any statute enacted for the safety of employees, head brakeman riding on train near the engine *held*, as matter of law, under evidence and in view of the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), to have assumed risk of injury therefrom.

On Motion for Rehearing.

2. **Pleading** &#8680;406(7)—**Defendant cannot be subjected to judgment for want of more specific plea of assumed risk, where no exception thereto was interposed.**

In brakeman's action against railroad for injuries from hot cinders, where plaintiff alleged that railroad adopted no rule for signals of intention to cast sand into the fire box so that brakemen might protect their eyes from injury by sand, soot, or other matter, and case was tried on such theory, defendant cannot be subjected to judgment for want of more explicit plea of assumed risk, where its answer in general terms pleaded assumed risk as a defense, and plaintiff interposed no exception nor asked that plea be made more specific.

Appeal from District Court, Harris County; Roy F. Campbell, Judge.

Action by Ray R. Hawthorne against the Texas & New Orleans Railroad Company. From a judgment for plaintiff, defendant appeals. Reversed and rendered.

Garrison & Watson, of Houston, for appellant.

Charles Murphy and John W. Parker, both of Houston, for appellee.

LANE, J. Ray R. Hawthorne brought this suit against the Texas & New Orleans Railroad Company to recover the sum of $30,000 for damages alleged to have been suffered by him by reason of the negligence of the railroad company.

In the plaintiff's first amended petition, upon which he went to trial, he substantially alleged: That on the 2d day of September, 1925, plaintiff, while in the employ of the defendant as a brakeman on a freight train operated by defendant on its said railway, and while in the regular performance of his duties, was on top of one of defendant's freight trains, near the head thereof, and, while passing through the switch limits of a station on said railway, namely, Tulane, the engineer or fireman operating the engine drawing the said train cast sand into the fire box on the engine for the purpose of forcing the sand through the flue of the engine and out of the smokestack, cleaning out the flues of soot and other matters accumulating therein; that the sand passing out of the smokestack struck plaintiff in the face, entering his eye, greatly injuring same; that, at the time he was injured, the train on which he was a brakeman was destined to points in the state of Louisiana; and that he, as well as the Texas & New Orleans Railroad Company, was engaged in interstate commerce.

The particular allegations of negligence were:

(1) That the engineer or fireman placed the sand in the fire box at an unusual time and place, namely, within or just opposite the station limits of the station of Tulane.

(2) That the said engineer or fireman cast sand into the fire box as aforesaid without notice or warning to plaintiff of their intention to do so, knowing at the time that plaintiff was in a position to be exposed to the dangers of the sand, soot, and other matters injuring his eyes.

(3) That the defendant company was negligent, in that it had failed to adopt and promulgate a rule requiring the engineer and fireman to give notice or warning by appropriate signals, namely, by word of mouth, by the whistle of the engine, by the bell thereon, by displaying or waving a flag by day, or a light by night, or by all or any two thereof in combination, or by other means or in other manner, which were well known, or should be

---

&#8680;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error refused October 19, 1927.

well known to defendant, and unknown to the plaintiff; that the time and place when and where the engineer or fireman would place sand into the fire box of the engine for the purpose of cleaning out the flues was unknown to the brakeman on the train, and in the nature of things could not be known by him in the exercise of due diligence on his part; that, when sand was placed in the fire box, it passed through the flues out of the smokestack, the particles of sand becoming red hot, would blow back in the opposite direction to which the train was moving, striking the plaintiff and other brakemen, who might be on top of the train, and, not having any knowledge as to what particular time or place the sand would be placed in the fire box, they were unable to protect themselves against danger; that the defendant was engaged as a common carrier by its said railroad in commerce between the state of Texas and the state of Louisiana and other states and territories and the District of Columbia, and "the plaintiff was at said time employed by defendant in such commerce."

The defendant in its amended answer filed (1) a general demurrer and general denial; (2) plea of contributory negligence; and (3) defendant specially pleaded: That it was engaged in interstate commerce at the time plaintiff claims to have been injured; that it had promulgated no rules whereby the plaintiff was warned of any particular time or place where sand would be placed in the fire box for the purpose of cleaning said flue; that the danger of plaintiff being injured by hot particles of sand that would escape through the smokestack was known to the plaintiff and had been known to him for some time prior to the time of the accident; that, under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), the plaintiff's injuries were the result of one of the risks assumed by him ordinarily incident to the business in which he was engaged; that the plaintiff not only assumed the ordinary risks incident to the business in which he was engaged, but also assumed risks growing out of the negligence of the defendant company, its agents, servants, or employees of which he had knowledge or which was plainly observable to him; that, if the defendant had not promulgated any rules warning its employees of the time and place when sand would be placed in the fire box, said fact was fully known to the plaintiff at the time and long prior to his injuries, and by reason of said facts the plaintiff assumed the risk which under the federal Employers' Liability Act was a complete bar to plaintiff's cause of action.

The case was submitted to the jury upon special issues. In connection with such issues the court correctly defined the terms "negligence," "contributory negligence," and "proximate cause." Special issues Nos. 1 to 8, inclusive, are as follows:

"Special issue No. 1. Did or did not the method employed by defendant for cleaning the flues of its locomotives while running on its road by forcing sand through the same and out of the smokestack expose its train employees or any of them while serving on such trains to the risk of injury of their eyes by the said sand coming in contact therewith? Answer 'It did' or 'It did not.'

"Special issue No. 2. If you answer the preceding issue 'It did,' then could defendant have established a signal to be given by the whistle on the engine which would have advised the train employees of the intention of the engineer or fireman to put the sand through the flues for the purpose of cleaning them while the train was in motion? Answer 'It could' or 'It could not.'

"Special issue No. 3. If you answer the preceding issue 'It could,' then was it the duty or was it not the duty of the defendant, in the exercise of ordinary care, to adopt and enforce a rule prescribing a signal by whistle to be given by the engineer or fireman in advance of putting the sand through the flues, for notice to the trainmen, including the head brakeman? Answer 'It was' or 'It was not.'

"Special issue No. 4. If you answer the preceding issue 'It was,' then was the failure of defendant to adopt and enforce such a rule negligence? Answer 'It was' or 'It was not.'

"Special issue No. 5. If you answer the preceding issue 'It was,' then was or was not such negligence a proximate cause of the injury of plaintiff? Answer 'It was' or 'It was not.'

"If you have answered each of the foregoing special issues in the affirmative, then you will proceed to answer the following special issues; but, if you have not answered each in the affirmative, then you will without further consideration return your verdict into court.

"Special issue No. 6. Was or was not plaintiff guilty of contributory negligence by being at the place he was or by facing the locomotive as he did or in any other manner? Answer 'He was guilty of contributory negligence' or 'He was not guilty of contributory negligence.'

"Special issue No. 7. Did or did not the plaintiff assume the risk of injury? In connection with this issue you are instructed that, if you have answered issues Nos. 1 to 5, inclusive, in the affirmative, then, in order to find that the plaintiff assumed the risk of injury to his eye, he must have known that the engineer or fireman was going to put the sand through the flues at the time it was done, or must have acquired the knowledge of the fact while it was being put through, in time, by the exercise of ordinary care on his part, to have protected his eyes against injury from the sand. Answer 'He did not assume the risk' or 'He did assume the risk.'

"If you answer the preceding issue 'He did not assume the risk,' and have answered special issue No. 6 'He was not guilty of contributory negligence,' then you will answer the following:

"Special issue No. 8. What amount of money, paid in cash at this time, would fairly and justly compensate plaintiff for the injury, if any, he sustained? In answering this issue, you are instructed that the measure of such damages is that sum of money which, if paid in cash at this time, would fairly and justly compensate the plaintiff for the injuries pleaded by him, and

which you find from the evidence he sustained, if any; and in arriving at such sum of money, you will take into account the mental and physical pain suffered by him as a result of such injury, if any, the earnings lost by him on account of such injury to this time, if any, and the impairment of his ability to earn money in the future on account of such injury, if any. In connection with the foregoing, you are further instructed, with respect to the assessment of damages, that, if you have answered special issue No. 6 'He was guilty of contributory negligence,' then the plaintiff would not be entitled to full damages, but only a proportional amount bearing the same proportion to the full amount as the negligence attributable to defendant bears to the entire negligence attributable to defendant and the plaintiff, and in such case you will assess the plaintiff's damages accordingly. Let your answer be in dollars and cents as you find the facts to be. Of course, if the finding is that plaintiff was not guilty of contributory negligence and that he did not assume the risk, no assessment of damages will be made in this connection."

Answering such issues, the jury found (1) that the method used for cleaning the flues of the locomotive did expose the train employees to the risk of injury to their eyes by sand coming in contact therewith; (2) that defendant could have established signals by which the train employees would be advised of the intention of the operatives of the locomotive to put sand through the flues for the purpose of cleaning them while the train was in motion, and that it was the duty of the defendant, in the exercise of ordinary care, to have adopted and enforced a rule prescribing such signals, in advance of putting sand through such flues, for notice to the trainmen, especially the head brakeman, that a failure to adopt and enforce such rule was negligence, and the proximate cause of the injury to the plaintiff complained of; (3) that the plaintiff was not guilty of contributory negligence; (4) that plaintiff did not assume the risk of injury; and (5) that $16,000 would fairly and justly compensate plaintiff for the injury suffered by him by reason of the negligence of defendant.

[1] Appellant, for a reversal of the judgment and the rendition of one in its favor, contends, substantially, that, as the pleadings of the plaintiff and the undisputed evidence show that at the time appellee suffered his injury he was engaged in interstate commerce; that the undisputed evidence shows that the employment in which appellee was engaged at the time of his injury, and in which he had been voluntarily engaged for six years next preceding such injury, was dangerous; that such dangers were obvious and known to appellee, the defense of assumed risk was available to appellant under the federal Employers' Liability Act, and that it should be determined under the rule applicable to such act; and that, since the undisputed evidence shows that appellee voluntarily assumed the risk incident to his employment, the dangers of which were obvious and known to him, appellant was entitled to an instructed verdict in its behalf, and the court erred in not so instructing the jury, upon its request therefor; and that this court should reverse the judgment rendered for appellee and here render judgment for it.

We think the contention of appellant should be sustained. The plaintiff alleged:

"That, at the time of the injury of plaintiff as aforesaid, the defendant was engaged as a common carrier by its railroad in commerce between the state of Texas and the state of Louisiana and the other states and territories and the District of Columbia, and plaintiff was at said time employed by defendant in such commerce."

It is apparent from these allegations that the question of the assumption of the risk of injury by the appellee must be determined under the federal Employers' Liability Act as construed by the United States courts. If, therefore, no recovery could be had by the plaintiff in this case under the federal law, the plaintiff has no remedy.

In 39 Corpus Juris, § 385, at page 267, it is stated that the federal act, in cases such as this one, is exclusive in operation, and in note 35, p. 267, decisions of the federal courts, as well as those of several states, are cited in support of said statement.

If then, applying the rule above mentioned, it is shown by the undisputed evidence that the appellee assumed the risk of employment in which he received his injury, he cannot recover. In cases triable under the federal act, "when assumption of risk is established it constitutes a complete bar to an action by the servant for injuries sustained in the course of his employment." 39 Corpus Juris, § 891, p. 689. "The defense of assumption of risk is available under the federal Employers' Liability Act, which by its terms is limited to railroad employees, to the same extent as at common law; except in cases specially provided for; that is to say, except in cases where the railroad company has violated some statute enacted for the protection of its servants." 39 Corpus Juris, § 892, p. 689.

The undisputed evidence, as well as the pleadings of the plaintiff, show that at the time appellee suffered his injury he was engaged as a brakeman on a freight train of the Texas & New Orleans Railroad Company, a line of the Southern Pacific Company, transporting freight from the state of Texas to the state of Louisiana; that on the Southern Pacific lines the provision made for cleaning the flues of the locomotives with sand was as follows: A horn is put into the hole in the fire box door. When it is desired to clean the flues, the sand is put in the horn, and when the locomotive is working hard so as to force the sand through the fire box it is blown together with the soot, through the flues. The sand so used is ordinary coarse sand. This method of cleaning such flues is resorted

to about every 25 miles. No set number of miles is established for such work; it depends on the condition of the engine as to when the sand is applied. When sand is so used, it is sucked through the flues and goes back over the train. The smoke that comes out with the sand is very black, and is red hot until it gets back three or four cars from the engine. The sand forced through the flues in the manner mentioned is forced against the employees whose work requires them to be upon the cars to the rear of the engine. The railroad company had no rule requiring notice to be given to its employees upon its trains as to when sand was to be put through the flues, and no warning of any kind was ever given of the intention to so use sand. It was shown that the sanding of the engine ought to be done every 25 miles; that this had been the practice of engineers on engines burning oil on the Southern Pacific for at least 14 years. It is conceded that the railroad company could have established signals to warn the brakemen as to when sand was to be used to clean the flues.

Appellee testified as follows:

"On the 2d day of September, 1925, I was employed as a brakeman on the T. & N. O. division of the Southern Pacific. T. & N. O. means Texas & New Orleans. That is the Texas & New Orleans Railroad Company. My run was from Houston to Echo. I was working on a freight train. I have been thus employed for 6 years. I have been on that same run. I have been on the same kind of a train, except one year in passenger service. * * * My position on the train was at the head end, the head brakeman. Ray Hawkins was the rear brakeman. My position is on the front end of the train, and I was allowed to ride anywhere from the first to the tenth car, and while we were stopped at a station I was supposed to look half of the train over. When the train was running, my position was from the first to the tenth car. * * * My position on the train was head brakeman. When the train was approaching Tulane, I was standing on top of the head car. I was standing middleways of the car. That car was connected to the tender of the engine; I was standing on the car. I was facing east; I was facing the engine. The train was running about 25 miles per hour. Something happened to me at Tulane. I got sand in my eyes at Tulane. I was facing the engine; I was about 70 feet away from the smokestack of the engine. I was standing on the head car coming through Tulane in the regular position on the train, going to the station, and, as we were going through Tulane, and passed the water tank, I was standing in the middle of the car, and they sanded the engine out, and the sand hit me in the face, and, when it hit me in the face, I grabbed both eyes, and looked down, and I covered my eyes until the smoke passed, and I worked my eyes, and felt them full of sand, and I got down and crawled to the edge of the car to hold on until I got my eyes free of the sand. * * * During my services with the railroad company, I observed the action and effect of putting sand through the flues; it would cause a black smoke. The sand would cause the smoke to leave the smokestack very black after it comes out first, and then follows the sand and black smoke. It comes out in large quantities. The sand would come right back over the train ahead of the black smoke. I have not tested the length to see how far it would come back, but I have been back 10 or 12 cars and have ridden 15 cars from the head end and felt very few grains of sand as far back as the fifteenth car. With reference to whether it comes out hot or cold, my answer is, at night you can see a lot of it; it is red hot; you can almost dodge it when you see it leave the engine; you can almost dodge it by lying down and covering your face; that is hot as a ball of fire. The sand comes out of the engine before the smoke does. The smoke comes out in a large volume, a big volume. It is according to the speed of the train—the faster the train goes, the sort of force it gives. The faster the speed and the harder the engine works, the more force it has coming out of the engine. I have felt the sand strike me before, I had holes burned in my shirt.

"With reference to your question, 'How did the circumstances of those occasions compare with the one under consideration, were they alike or unlike?' my answer is they were alike. With reference to your question, 'When the sand would be put through and come out, what would always be the condition that attended it as to smoke, and the coming back of the sand, would it all come out at once, and the coming back of the sand, would it all come out at once, or would it come out in different ways?' my answer is sometimes it would all come out at once, and sometimes it would come out in streams. With reference to you wanting to know the way the sand acted, would it act practically the same every time the sand would be put through, my answer is, it was not the same every time; sometimes it would be smaller quantities, and sometimes in larger quantities. With reference to what would occur that would make you know that sand had been put through the engine, my answer is, by the sand hitting you in the face and the black smoke leaving the stack. When the sand was put through the engine, it was always attended by the sand coming back, and the black smoke coming out of the engine. I had some sand to come back on me many times before that. On those occasions the sand and the smoke acted substantially similar to what it did on the occasion when I was hurt. * * *

"While I was serving as head brakeman on that train they did not give me any warning that they were going to sand the engine. The engineer did not give any warning. * * * The defendant did not have any rule, during the time I worked for it, requiring the engineer or fireman to give notice of their intention to put sand through the flues by any signals. I have been working for the company 6 years. I worked 5 years as a freight brakeman. During that term of years I was working on the freight train from Houston to Echo. I am familiar with the operation of freight trains. I was fully familiar with them and knew how they were operated. I am acquainted with the road. I knew what they did do and did not do. I knew that all the time I was working. I know the engine has to be sanded. I knew they did sand them. I do not know that they sand an engine every 25 miles; they sand them frequently, I know that. They put the sand in the fire box.

They do not sand them usually when the engine is making a good rate of speed; they do not do that all the time. The reason they put the sand through is to clean out the flues, but he can do that running twenty miles an hour if he wants to. I know about it. I know what they did it for. I know about those hot cinders. I know they come out at night and you can see them. I know they come out of the smokestack. I know if the train was going east some of those cinders would fly back toward the caboose. I have known that a good while, since I have been there. I have known and have been on a train when those cinders would burn my shirt. I have laid down, covered up my face. They have set fire to my shirt on the train. I know that. I know they did not have a rule about giving a signal. I knew that all the time. * * * They did not come and tell me when they were going to do it. They never did give me a signal when they were going to do it. They never come to me and told me. They never did give me a signal. They had been doing that for 5 or 6 years. We had rather a heavy train, and when I was struck by the sand the engine was working rather hard. The sand came out in the usual way; that is, it did not come out in such quantity as might indicate there was something wrong with the stack. It is not unusual for sand to be placed in engines, and for it to be blown out of them, and, as I have stated above, there was nothing unusual about being struck by the sand."

From the undisputed facts, it is shown that appellee knew of the dangers incident to the work which he voluntarily chose to perform. Having such knowledge, and having voluntarily continued in such employment, he assumed the risk incident thereto.

In 39 Corpus Juris, under note 59, p. 688, it is said:

" 'The doctrine of assumption of the risk of his employment by an employee has usually been considered from the point of view of a contract, express or implied; but as applied to actions of tort for negligence against an employer, it leads up to the broader principle expressed by the maxim, Volenti non fit injuria. One who, knowing and appreciating a danger, voluntarily assumes the risk of it, has no just cause of complaint against another who is primarily responsible for the existence of the danger. As between the two, his voluntary assumption of the risk absolves the other from any particular duty to him in that respect, and leaves each to take such chances as exist in the situation, without a right to claim anything from the other. In such a case, there is no actionable negligence on the part of him who is primarily responsible for the danger.' O'Maley v. South Boston Gas Light Co., supra [158 Mass. 135, 32 N. E. 1119, 47 L. R. A. 161].

" 'When the negligence of the master is made to appear, then the doctrine of assumption of risk as a bar to the recovery comes into operation. If the servant, knowing and comprehending the danger, voluntarily exposes himself to it, though not negligent in so doing, he is precluded from a recovery for an injury that results therefrom. By thus encountering the risk he is regarded as having excused the resulting injury under the maxim volenti non fit

injuria.' Carleton v. Fairbanks, supra [88 Vt. 537, 93 A. 462]."

Again under note 60:

" 'The first ground upon which this rule of law rests is the maxim, Volenti non fit injuria. A servant is not compelled to begin or to continue to work for his master. * * * The second ground upon which assumption of risk is based is that every servant who enters or continues in the employment of a master without complaint thereby either expressly or impliedly agrees with him to assume the risks and dangers incident to the employment which a person of ordinary prudence in his situation would have known by the exercise of ordinary diligence and care, and to hold his master free from liability therefor.' St. Louis Cordage Co. v. Miller [(C. C. A.) 126 F. 495, 63 L. R. A. 551]."

Again under note 62:

"The rule of the assumption of obvious risks does not rest wholly upon the implied agreement of the employee, but on the independent act of waiver, evidenced by his continuing in the employment with a full knowledge of all the facts."

The authorities cited in Corpus Juris, in support of the several rules above set out, are so numerous that we will not undertake to cite them here. Among such cases are the cases of Boldt v. Penn. Ry. Co., 245 U. S. 441, 38 S. Ct. 139, 62 L. Ed. 385, and Seaboard Air Line Ry. Co. v. Horton, 233 U. S. 492, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475, cited in appellant's brief.

The disposition we have already made of the contention of appellant renders unnecessary any discussion of the other assignments made by appellant.

For the reasons pointed out, the judgment of the trial court is reversed, and judgment is here rendered for appellant.

Reversed and rendered.

GRAVES, J. I concur in the judgment, mainly upon this consideration:

As submitted to the jury, the appellee based his right of action upon the sole charge that appellant had been negligent in failing to adopt and promulgate a rule for the protection of its employees against the dangers arising from the *method* used by it in cleaning its engine flues with sand; he then admitted, as the testimony quoted in Judge Lane's opinion shows, that he had known, not only of that failure, but also of the danger existing without it all the while, and yet remained without complaint in the service for 6 years. The cause being within the purview of the federal Employers' Liability Act, and therefore ruled by the decisions of the federal courts, this undisputed situation seems to me to bring it within the principles as to assumed risk declared by the United States Supreme Court in Chicago, R. I. & P. Railway v. Ward, 252 U. S. 18, 40 S. Ct. 275, 64 L. Ed.

430, and the other holdings therein referred to. It was the employer's usual and habitual method of carrying on the very business he was employed to serve, in that he thus alone complained of, and, when it was shown by his own testimony that he had known throughout his long service of the indulgence in that way of conducting it, granting that it was negligent, and of the consequent dangers, it seems to me his position was not different from that of an employee generally, who either actually knows of the dangers arising from his employer's negligence, or to whom they are plainly observable (39 Corpus Juris, par. 933, p. 726, and cited authorities); having thus grounded his action solely upon the failure to have the rule, and then shown that the failure had been both plainly observable and admittedly well known to him for six years, as well as the continuing danger of so serving without it, the right he might otherwise have had appears to have been extinguished.

It is true under the undisputed facts, as appellee ably urges, that he did not and could not know just when the particular danger from the flue-sanding process would occur, and therefore for the nonce was unprepared to protect himself against it; but that is not what he complains of—only the negligent failure to have the rule. This he did know, and, further knowing that without it the almost hourly recurring danger from flying particles of sand and cinders was continuously imminent, must be held to have reasonably anticipated that just such an injury as so unfortunately visited him might occur at any time. All this advance knowledge seems to differentiate appellee's case from being the result of an unanticipated sudden emergency, as was that of Railway v. Ward, supra, and to place him in the same category with one who, knowing, dares maintain himself in the face of the danger from which his injury results. Under the authorities last referred to, such a one cannot recover. See, also, Seaboard Air Line Railway v. Horton, 233 U. S. 492, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475; Jacobs v. Railway, 241 U. S. 229, 36 S. Ct. 588, 60 L. Ed. 970, and cases collated on page 461 of volume 3, U. S. Statutes Annotated.

Neither can the Texas statute on assumed risk (R. S. art. 6437, of 1925) change the rule on that subject as applied by the federal courts in causes arising under the federal Employers' Liability Act; section 4 of that act (U. S. Statutes Annotated, vol. 3, p. 459), in expressly eliminating the defense of assumption of risk in cases where the carrier's violation of a statute enacted for the safety of its employees contributed to the injury, has been held to plainly evidence the legislative intent that in all other cases such assumption shall have its former effect *as a complete bar to the action.* See authorities cited at middle of page 463, vol. 3, U. S. Statutes Annotated. This Texas statute does qualify the rule by limiting it to cases where a man of ordinary prudence would not continue to work with real or imputed knowledge of the hazards to which he was being subjected.

It therefore seems to me that our Texas statute has nothing to do with the case, the federal jurisdiction having covered the field to the exclusion of state action, as the authorities cited in Judge LANE'S opinion make manifest.

The case of Frese v. Chicago, B. & Q. R. Co., 263 U. S. 2, 3, 44 S. Ct. 1, 68 L. Ed. 131, invoked in this connection by the appellee, furnishes no analogous precedent to the contrary. No question of assumed risk nor yet of *contributory* negligence was there involved; it being simply an instance of where the engineer's primary negligence in violating a nondelegable duty imposed upon him by a positive statute of the state where the injury occurred furnished the sole cause of the accident, which situation relieved the carrier of liability under the federal Liability Act. Grand Trunk Western Railway v. Lindsay (C. C. A.) 201 F. 836; Id., 233 U. S. 42, 34 S. Ct. 581, 58 L. Ed. 838, Ann. Cas. 1914C, 168; Fletcher v. Railway, 36 S. D. 401, 155 N. W. 3.

It may follow, as a result from these holdings, that an employee, circumstanced as this one was, has no alternative than to quit the service rather than knowingly incur such a risk, but if so, that apparently raises a legislative rather than a justiciable question.

### On Motion for Rehearing.

LANE, J. [2] By motion for rehearing, appellee, Hawthorne, complains of the statement made by us of that part of appellant's answer setting up assumed risk as a defense, and insists that such statement is incorrect, in that it states that defendant alleged that appellee knew that appellant had adopted no rule, as it was its duty to do; requiring its engineer or fireman to give notice or warning by some appropriate signal to its trainmen of their intention to cast sand into the fire box.

We admit that the statement made by us which is complained of is not a substantial copy of that part of appellant's plea setting up the defense of assumed risk, but is a substantial copy of that defense as stated in appellant's brief, which was not by appellee objected to as being incorrect.

The rules prescribed for the government of this court provide that, if the statement made by appellant of the nature and result of the cause is not distinctly challenged by the opposing party, it may be accepted by the court as correct.

Appellee, as plaintiff below, made the following allegation:

"That defendant had failed to adopt and promulgate a rule (as in duty bound it should have

done), requiring its engineers and/or firemen to give notice or warning by appropriate signals, namely, * * * by the whistle of the engine, * * * of their intention to cast sand into the fire box, as aforesaid, to the end that the brakemen on the train, and especially the head brakeman (plaintiff being such brakeman), might protect their eyes from injury by the *sand, soot, and other matter*, as they could have done; and that, had there been such a rule and notice or warning given, plaintiff could and would have protected his eyes from injury by the *sand, soot, and other matter*.

"And, in connection with the foregoing, plaintiff alleges that the time and place when and where the engineer and/or fireman would cast sand into the fire box for the purpose of cleaning the flues, as aforesaid, would be unknown to the brakemen on the train, and in the nature of things could not be known to them by any diligence on their part; that the sand, when it passes out of the smokestack together with the soot and other matter, is red hot, and the soot and other matter often in flames, and blows back over the engine and train with great speed, and is a real menace to the eyes of the brakemen and other train employees, and a danger against which they cannot protect themselves by any action of their own in the absence of notice or warning." (Italics ours.)

By its answer to such allegations, appellant, defendant below, in general terms pleaded assumed risk as a defense.

The plaintiff interposed no exception, either general or special, to the plea of the defendant, and defendant was not called upon to make more specific its general plea of assumed risk.

In the absence of a special exception to such plea, we think it was sufficient, especially so since, upon trial, appellee so accepted it and took the stand as a witness in his own behalf and testified that, prior to the time of his injury, he had worked as brakeman on freight trains for defendant for five years; that he knew that during that time the defendant had no rule requiring the engineer or fireman to give notice of their intention to put sand through the flues by any signal; that he was familiar with the operation of freight trains, and knew how they were being operated with reference to sanding the flues; that he knew about those *hot cinders;* that he knew they came out of the smokestack and would fly back and burn brakemen on the train; that they had burned his shirt; that he had lain down and covered his face to prevent his face from being burned.

Appellee admits that:

"The gist of his action was negligence of appellant in not adopting and enforcing an adequate rule for the protection of its employees against dangers arising from the method employed by appellant of cleaning its engine flues by forcing sand through them under high pressure * * * by requiring its engineers or firemen to give prior notice or warning thereof by some signal."

Considering the record as it came to us, it is apparent that the theory upon which the plaintiff tried the cause was that, notwithstanding the plaintiff knew that the defendant had adopted no rule, as it was its duty to do, requiring its engineer or fireman to give notice or warning by some appropriate signal to its brakemen of their intention to cast sand into the fire box, appellee was entitled to a recovery because he could not, in the absence of notice that sand was to be used at the time it was used, protect himself against its injurious effect. No other theory was presented to the trial court.

It would, we think, be unjust to here subject appellant to a judgment against it for want of a more explicit plea of assumed risk, in the absence of a special exception to such plea, for, had such exception been interposed, appellant could, and doubtless would, have met any objection which might have been made to its plea.

For the reasons pointed out, the motion is overruled.

Overruled.